UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ASHLEY TREGO                                                    PLAINTIFF


v.                                        CIVIL ACTION NO. 3:20-CV-00272-CRS


BULLITT COUNTY FISCAL COURT, *et al.*                          DEFENDANTS


## MEMORANDUM OPINION

This matter is before the Court on the motion of Defendants Bullitt County Fiscal Court ("BCFC"), Angie Greenup ("Greenup"), David Nemes ("Nemes"), and Lisa Craddock ("Craddock") (collectively, "Defendants") for summary judgment on all claims (DN 37) and the motion of Plaintiff Ashley Trego ("Trego") for partial summary judgment (DN 40). Both motions seek relief pursuant to Fed. R. Civ. P. 56. The parties have each responded and replied accordingly (DNs 48 and 53; DNs 45 and 51) and both matters are ripe for adjudication.

### I.    Factual Background

BCFC is a legislative body of Bullitt County, Kentucky and, pursuant to Ky. Rev. Stat. Chapter 67, "has the authority to hire persons to perform work incidental and necessary for the operation and execution of certain duties and organizations including the Bullitt County Animal Shelter." DN 1-2, PageID# 9. Trego was hired by BCFC in the summer of 2017 to work as a part-time Animal Care Attendant at the Bullitt County Animal Shelter ("the Animal Shelter"). *Id.* At that time, Greenup was the Director of the Animal Shelter, Nemes was the Assistant Director of the Animal Shelter, and Craddock was the Deputy Judge-Executive of the BCFC. *Id.*

1

A. *Trego's Medical Conditions and Limitations*

Because she suffers from a number of medical ailments, including shortness of breath and severe back pain, Trego has received social security disability benefits since December 2016. DN 40-3, PageID# 859-67. Prior to being hired as an Animal Care Attendant, Trego called the Social Security office on speakerphone with Greenup present so that they could inquire as to how many hours Trego could work and how much pay she could receive without losing her benefits. *See* Trego Depo., DN 37-3, PageID# 274. Thus, Defendants were aware that Trego was disabled. However, it is unclear as to whether Defendants knew the extent of Trego's work limitations and what, if any, accommodations were put in place due to these limitations.

At no time during her employment at the Animal Shelter did Trego submit written requests for any accommodations. DN 37-3, PageID# 280. Trego testified that she made "verbal" arrangements with Greenup and Craddock for accommodations regarding her lifting restrictions and breathing issues. DN 46-1, PageID# 1041-44, 1046. She also claims that she had an unwritten agreement to be able to park close to the cat trailer where she worked. *Id.*, PageID# 1077-80. Trego purports that it was common knowledge among her co-workers at the Animal Shelter that she had medical problems, although not everyone knew the extent of her issues. *Id.*, PageID# 1070-71.

Trego claims that Greenup and Craddock had a comprehensive understanding of her health problems. DN 46-1, PageID# 1072. Prior to her paid position as an Animal Care Attendant, Trego had volunteered at the Animal Shelter and knew Greenup. Trego Depo., DN 46-1, PageID# 1040. Because of her time spent as a volunteer, Trego claims that Greenup was aware that she had "respiratory issues," "back issues," lupus, and seizures, and that she was, overall, "in bad health." *Id.*, PageID# 1040-41. She maintains that, because Greenup knew about these conditions prior to her hiring, certain restrictions were factored into the type of duties Trego could perform and the

hours she could work. *See id.*, PageID# 1072 (stating that she was hired for "light-duty stuff" and for minimal hours because Greenup knew her medical situation).

Greenup acknowledged that she knew that Trego had "some health issues" when she was hired, and that Trego was provided "some accommodations" for her job. Greenup Depo., DN 37-4, PageID# 298. Nemes testified that when he was hired as Assistant Director in December 2017, he "understood that [Trego] was restricted to working 10 hours a week due to disability" and "that she was not permitted to lift heavy objects." Nemes Depo., DN 37-27, PageID# 607, 611. While Craddock testified that she knew of Trego's health issues "in the very beginning before she was hired," Craddock also stated that no special accommodations were made for Trego when she was hired because Trego "made it clear that . . . it was not an issue." Craddock Depo., DN 37-5, PageID# 386.

### B. Factual Basis for Alleged ADA Violations

#### 1. Alleged Discriminatory Conduct and Hostile Work Environment

Trego alleges that "around October 2017," she began experiencing discrimination at work when Defendants "create[ed] a hostile work environment, refus[ed] to provide reasonable accommodations, and retract[ed] certain reasonable accommodations" that had previously been provided. DN 1-2, PageID# 11. Specifically, Trego claims that Greenup and Nemes "verbally harassed, abused, and questioned [Trego] about her disability." *Id.* Trego met with Craddock in December 2017 when she says the harassment became "unbearable" and claims that after this meeting the harassment became even worse. *Id.*, PageID# 12. In July 2018, Trego took leave for a medical procedure, after which she alleges the offending behavior escalated further. *Id.*

#### 2. August 23 Meeting and Disciplinary Actions

A meeting between Trego, Craddock, Nemes, and Greenup was eventually held on August 23, 2018, during which Trego, again, expressed her concerns about workplace harassment and discrimination. *Id.*, PageID# 13. At this meeting, Trego received multiple disciplinary writeups for allegedly violating various BCFC policies by performing below standards, leaving work early without permission, and posting "a derogatory comment" about the Animal Shelter on social media. DN 1-2, PageID# 13; DNs 37-7, 37-10, and 37-21. Most relevant to the present action, however, appears to be the discipline Trego received for her alleged conduct after taking medical leave in early July 2018. DN 37-13.

Trego's medical leave began on July 9 and she was originally supposed to return to work on July 16. DN 37-14, PageID# 489-92. She was granted two extensions to her leave of absence, pushing her return-to-work date out to August 17. *See* DN 37-1, PageID# 1003; DN 40-3, PageID# 878, 894. On August 6, the BCFC sent Trego a letter informing Trego that prior approval from the Department Executive and County Judge/Executive was required for a medical leave of absence of more than thirty days. DN 40-3, PageID# 895. The letter also indicated that Trego needed to have her healthcare provider complete a "Healthcare Provider Employee Capabilities Assessment" ("HCAF") and an "Authorization for Absence" and that she should return these documents to the Bullitt County Animal Control ("BCAC") management "no later than one week from the date of receipt." *Id.* The USPS tracking information for this letter indicates that it was delivered on August 8, 2018 (DN 37-16, PageID# 503), making the deadline for submitting the requested documents August 15, 2018.

On August 14, Trego contacted Greenup asking for more time to complete the required documentation and Trego was granted a one-week extension, making the new deadline for submission the close of business on August 21. DN 37-26, PageID# 558. On August 15, Trego

4

emailed BCAC management and the office of the County Judge/Executive partial copies of her medical records and indicated that she would "try to" have the HCAF submitted by August 21. *Id.*, PageID# 559-63. Nemes responded, informing Trego that "the information provided was insufficient" and reminded Trego that she would not be permitted to return to work until she submitted the HCAF. *Id.*, PageID# 564. Trego informed management at BCAC on August 20 that she would not have the required documentation ready for submission until August 22—one day after it was due. *Id.*, PageID# 591. She was not granted an extension and she failed to provide the documentation by the close of business on August 21. *Id.* For this infraction, Trego received the disciplinary action of "counseling/warning" during the August 23 meeting. DN 37-13, PageID# 487.

### 3. *Request of Work Release Letter*

Trego was scheduled to return to work on August 28, 2018. DN 37-26, PageID# 590. That day, BCAC management received a note from Trego's cardiologist stating that Trego would be wearing a heart monitor for 30 days, beginning August 27, but did not mention if Trego could work without restrictions. DN 37-19, PageID# 531. Nemes sent Trego an email on August 29 requesting her to have her physician "send a letter releasing you to work ASAP" and "to specify if this release to work is with or without restrictions." DN 37-17, PageID# 523. Nemes informed Trego that if the release was not received "before her next scheduled shift," the county Judge/Executive would set a "reasonable deadline for it's [*sic*] submission." *Id.* On September 5, Nemes informed Trego that the deadline for submission was set for September 12, 2018. DN 37-17, PageID# 523-24. Trego did not submit the requested release by September 12, so on September 13 Trego was notified that she was suspended from work for the dates of September 18, 20, and 25. DN 37-23, PageID# 536. Because Trego had still not submitted the release as of September

27, she was not allowed to report for work on that day and was marked with an unexcused absence. DN 1-2, PageID# 15. Trego submitted a note from Dr. Rosenberg Reyes dated September 28 recommending that she be excused from work from September 27 through October 1, 2018. DN 40-3, PageID# 922. On October 1, Trego submitted the requested medical release regarding the heart monitor. *Id.*, PageID# 923.

### 4. *Nemes' Inquiry at Trego's Doctor's Office*

Nemes testified that after receiving Dr. Reyes' note recommending that Trego be excused from work from September 27 through October 1, 2018, he went to Reyes' office to inquire about the exact date that Trego could return to work. DN 40-3, PageID# 988. According to Nemes, he wanted to know if Trego could return on or after October 1. *Id.*

### 5. *Elimination of Position*

On October 16, 2018, Nemes sent an email to Trego and the other part-time Animal Care Attendant informing them that the decision had been made to consolidate their two part-time positions into one full-time position. DN 37-24, PageID# 538. Nemes indicated that if either part-time worker was interested in the full-time position, she would need to respond by October 19 to be considered as an "in-house applicant" before the job posting would be made public. *Id.* Trego did not express an interest in the full-time position, so she was informed that her last day as a BCFC employee would be on October 24, 2018. *Id.*, PageID# 539.

### II.   *Alleged ADA and Kentucky State Law Violations*

Trego asserts that Defendants violated various provisions of 42 U.S.C. § 12112. According to Trego:

1. Before she was hired, Greenup inquired into her disability by contacting the office of Social Security Disability Insurance in violation of 42 U.S.C. §12112(d)(2)(A). DN 1-2, PageID# 18.

2. BCFC "failed and refused to provide [Trego's] requested accommodations, and in some cases retracted previously provided accommodations" in violation 42 U.S.C. §12112(b)(5)(A). *Id.*, PageID# 19.

3. Trego "was subjected to discrimination in violation of 42 U.S.C.A. § 12101, *et. seq.* Bullitt County Fiscal Court, by and through its employees and agents, including Defendants Greenup, Craddock, and Nemes, bullied and harassed Plaintiff about her disability, maliciously released private healthcare information in violation of HIPPA, retroactively removed reasonable accommodations previously provided to Plaintiff, forced Plaintiff to engage in activities that were detrimental to her disability, and created a hostile work environment." *Id.*

4. Nemes and Greenup "inquired into the nature and severity of [Trego's] disability after she was hired" in violation of 42 U.S.C. §12112(d)(4)(A). *Id.*  This included Nemes' visit to Reyes' office in September 2018. *Id.*

5. Trego "was subjected to an objectively severe and pervasive hostile work environment in violation of 42 U.S.C.A. § 12101 *et. seq.*" *Id.*, PageID# 20.

6. She was "treated, classified, and ultimately segregated in a way that adversely affected her job opportunities and status" in violation of 42 U.S.C. §12112(b)(1). *Id.*

7. BCFC "required paperwork that was above and beyond what was required for non-disabled employees and . . . subject[ed] [Trego] to unreasonable policies, supervision, discipline, and other adverse actions" in violation of 42 U.S.C. §§12112(b)(3)(A) and (B). *Id.*

8. She was "constructively terminated based on her disability in violation of 42 U.S.C. §12112." *Id.*

Trego seeks to hold BCFC liable for all acts of its agents and employees and maintains that "[a]s a direct and proximate result of Bullitt County Fiscal Court's [ADA] violations . . . , Plaintiff has suffered loss of wages, salary, and emotional and psychological pain and suffering in the form of emotional distress, embarrassment, humiliation and mental anguish." DN 1-2, PageID# 21.

Trego also makes a claim that she was subject to unlawful retaliation in response to her complaints of a hostile work environment and reports of allegedly discriminatory conduct. DN 1-2, PageID# 23-25. Though she does not specify in the complaint, it appears from the briefing that Trego is pursuing this claim under 42 U.S.C. § 12203, which makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Trego also makes the corresponding disability discrimination and retaliation claims under Kentucky law. DN 1-2, PageID# 15, 21.

### III.  *Procedural Posture*

Defendants have moved for summary judgment on all federal and state law claims. DN 37. Trego has moved for partial summary judgment on the following two claims:

1. Defendants violated 42 U.S.C. §12112(d)(4)(A) by requiring Trego to acquire and submit a medical release after receiving notice that she would be wearing a heart monitor at work because this requirement was not job related or a business necessity. DN 40-1, PageID# 819.

8

2. Nemes and BCFC violated 42 U.S.C. §12112(d)(4)(A) when Nemes went to Reyes' office without Trego's permission to inquire about Trego's medical documentation. DN 40-1, PageID# 821.

### IV.    *Legal Standard*

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). A fact is "material" if its resolution might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

### V. *Discrimination Under 42 U.S.C. § 12112*

The Americans with Disabilities Act ("ADA") prohibits "a covered entity," including an employer, from discriminating against "a qualified individual with a disability," 42 U.S.C. §§ 12111(2) and 12112(a). "Discrimination" under the ADA includes:

> (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
>
> . . .
>
> (3) utilizing standards, criteria, or methods of administration—
>> (A) that have the effect of discrimination on the basis of disability; or
>> (B) that perpetuate the discrimination of others who are subject to common administrative control;
>
> . . .
>
> (5)
>> (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

*Id.* at § 12112(b)(1), (3), and (5). The Act defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* at § 12111(9). As previously discussed, Trego claims Defendants violated several of the above provisions.

### A.  Proper Framework for Analysis

When assessing claims of intentional discrimination brought pursuant to the ADA, the Court may apply one of two possible rubrics, "depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016)). When a plaintiff presents only indirect evidence of discrimination, the Court must apply the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination." *Anderson v. City of Blue Ash*, 798 F.3d 338, 356-57 (6th Cir. 2015) (cleaned up). This requires the plaintiff to show: "(1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Id.* at 357 (citing *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008)).

On the other hand, when presented with direct evidence of disability discrimination, the finder of fact need not draw any inferences to conclude that the disability was at least a "motivating factor," and the *McDonnell Douglas* burden-shifting does not apply. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852-53 (6th Cir. 2018) (citations omitted). In such a case, the plaintiff "bears the burden of establishing that he or she is disabled and otherwise qualified for the position despite his

or her disability: a) without accommodation from the employer; b) with an alleged essential job requirement eliminated; or c) with a proposed reasonable accommodation." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citation and internal punctuation omitted).

Both parties to the instant case lay out the analysis of Trego's ADA claim using the burden-shifting framework from *McDonnell Douglas*. *See* DN 37-1, PageID# 1008-15; DN 48, PageID# 1161-66. However, at least some of the allegations of Trego's complaint involve direct evidence of discrimination. *See Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007) ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence . . . of discrimination." (citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996)). The Court need not resolve this issue, as the controversy at the center of Trego's AD claim appears to be whether she was "otherwise qualified" for the position as an Animal Care Attendant—an element that Trego would have to establish regardless of whether the "direct" or "indirect" framework is applied.

### B.  Whether Trego was "Otherwise Qualified"

Defendants put forth two arguments as to why Trego was not "otherwise qualified" for her position. Each will be discussed below.

#### 1.  Performance of Essential Duties

 "To show that she is otherwise qualified for a position. . . an employee must show that she can perform the essential functions of a job with or without an accommodation." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018). "'A job function is essential if its removal would fundamentally alter the position.'" *Id.* (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018)). "This analysis does not lend itself to categorical rules—it is 'highly fact specific.'" *Id.* (quoting *Mosby-Meachem*, 883 F.3d at 605).

Defendants maintain that Trego was not able to perform the essential duties of her job with or without reasonable accommodation (DN 37-1, PageID# 1009-12), though the parties disagree as to what duties were "essential" to the position of Animal Care Attendant. To determine what functions of a job are "essential," courts can look to "the amount of time spent on a particular function; the employer's judgment; 'written job descriptions prepared before advertising or interviewing' for the position; and the consequences of not requiring the employee to perform the particular function." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854-55 (6th Cir. 2018) (quoting 29 C.F.R. § 1630.2(n)(3)).

Defendants point to the duties set forth in the job description of an Animal Care Attendant. DN 37-1, PageID# 1010 (citations omitted). According to the job description, an "Animal Care Attendant" at the Animal Shelter works "[u]nder direction of the Director or Assistant Director" and is expected to "provide[] for the constant cleanliness of cages, runs, and shelter areas and the proper feeding and care of all shelter animals." DN 37-2, PageID# 267. An Animal Care Attendant is responsible for: cleaning, disinfecting, and maintaining various shelter areas, equipment, and tools; taking charge and handling animals "as required"; restraining "hard to control animals"; walking dogs; "unpacking, labeling and stocking of shelter supplies and donations"; and emptying trash. *Id.*, PageID# 267-68. The description also indicates that an Animal Care Attendant must have the ability to "[p]erform moderately heavy physical labor" and that the job "often" requires "lifting and carrying materials weighing up to 40lbs"; "frequently" required "handling materials of up to 20lbs"; "walking and/or standing for long periods"; and using "strength or agility in capturing and restraining stronger, more active animals." *Id.*, PageID# 269-70.

Trego maintains that the job description does not reflect the duties that she was actually expected to perform. DN 48, PageID# 1146, 1162. Trego testified that, upon her hiring, Greenup

13

verbally informed Trego that her duties would be "to do the cat trailer" and to answer phones,

"help with laundry," and "do dishes." DN 46-1, PageID# 1039-40. Trego also cites Greenup's

testimony describing Trego's job responsibilities:

> Q (Trego's Counsel): What -- what were her job duties at the time
> of hiring?
> A (Greenup): Just kennel staff.
> Q: Now, she -- was she hired mainly to work with the cat trailers?
> A: She was, but she also helped with other duties at the shelter.
> Q: Okay. So what were her duties as it relates to the cat trailer?
> A: She cleaned the cats' cages, fed the cats, watered the cats. And
> then she was -- she would give medications when we asked her to.
> Clean and tick, weighing the cats.
> Q: Okay. And when you said that she had other duties, what were
> her other duties outside of the cat trailer?
> A: When she finished up the cat trailer, she would come over and
> clean the office, answer the phones, if needed. Laundry, dishes.
> Q: So she didn't -- did she work with the dogs?
> A: Every once in a while, she would walk a dog.
> Q: Okay. But the dogs wasn't part of her main?
> A: (Interrupting) Correct. By the time she was done with the cats,
> we had kennel -- we had another kennel staff that dealt with the
> dogs.
> Q: Was there a particular reason she didn't deal with the dogs?
> A: No. The cats pretty much took up the majority of her time.

DN 38-1, PageID# 753-54.

Irrespective of which duties were "essential" to Trego's position, a Notice of Decision

rendered by an administrative law judge with Social Security Administration ("SSA") Office of

Disability Adjudication and Review ("the Notice of Decision") regarding Trego's disability status

indicates that she was not "otherwise qualified" for her job. DN 37-1, PageID# 1010-11. According

to the Notice of Decision, as of December 2016, Trego was "unable to perform any past relevant

work," including as an "animal caretaker." DN 37-25, PageID# 551. The Notice of Decision

further states that "[t]he claimant has the residual functional capacity to perform sedentary work .

. . except that she could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and

stairs" and "there are no jobs that exist in significant numbers in the national economy that claimant can perform." *Id.*, PageID# 547, 551.

The Sixth Circuit has recognized that representations made in an SSA application "are relevant evidence of the extent of a plaintiff's disability, upon which an employer may rely in attempting to establish that an ADA plaintiff is not a qualified individual with a disability.'" *Griffith v. Wal-Mart Stores*, 135 F.3d 376, 383 (6th Cir. 1998) (quoting *Weigel v. Target Stores*, 122 F.3d 461, 467-68 (7th Cir. 1997) (internal quotation marks omitted)). Although these representations "should not be the subject of judicial estoppel or a theory of 'super admissions,'" a court can consider such statements in the context of the record as a whole "under traditional summary judgment principles." *Id.* at 382. That an administrative law judge found Trego "unable to perform" the duties of an animal caretaker in December 2016 supports Defendants' argument that Trego was unable to perform the essential duties of an Animal Care Attendant when she applied for the job a mere six months later.

Trego urges the Court to reserve the question of whether she was "otherwise qualified" for the jury, claiming that she "has presented sufficient proof to establish a genuine issue of material fact" on this matter and compares her situation to that of the plaintiff in *Griffith*. DN 48, PageID# 1161 (quoting 135 F.3d at 384). However, the Court finds this comparison inapposite. In *Griffith*, the plaintiff claimed that he was able to perform the essential functions of his job, despite his disability. 135 F.3d at 383. He offered proof of positive work evaluations during the timeframe in question and his supervisor testified that the plaintiff "had no job performance problems." *Id.* at 383-84. The plaintiff argued that statements in his SSA disability application "did not contradict this proof":

> In the [SSA disability] application, Plaintiff stated he was unable to
> work because "no employer will hire me because of my condition

> and restrictions." Plaintiff argues that this statement is not
> inconsistent with his position that he could have, and actually had,
> worked at his former job with reasonable accommodation.

*Id.* at 384. Because the plaintiff offered evidence of acceptable job performance and demonstrated

that nothing in the SSA application directly contradicted this evidence, the Sixth Circuit in *Griffith*

found there was a genuine issue of material fact as to whether the plaintiff was "otherwise

qualified." *Id.*

Here, Trego does not provide evidence to overcome the findings in the Notice of Decision

and simply states that she was able to perform her job duties with "reasonable accommodations."

DN 48, PageID# 1161. Yet, unlike the plaintiff in *Griffith*, Trego does not offer proof that her work

performance was acceptable, nor does she argue that the statements in the Notice of Decision are

compatible with her claim that she was "otherwise qualified" to work as an Animal Care Attendant.

In fact, she does not address the statements in the Notice of Decision at all. Accordingly, Trego's

reliance on *Griffith* is not persuasive.

On a final note, Trego does not attempt to defend the reasonableness of the

accommodations that she claims allowed her to fulfill her essential duties and, thus, be considered

an "otherwise qualified" worker. Instead, she seems to argue that the reasonableness of these

accommodations is demonstrated by the fact that the accommodations existed in the first place.

*See* DN 48, PageID# 1161 (stating that Trego could perform her job with "reasonable

accommodations," such as providing Trego help with taking out the trash and "allowing her to

work less hours"), 1171 (referring to her parking space close to the building at work as a

"reasonable accommodation"). However, simply asserting that an accommodation is "reasonable"

does not make it so. Moreover, Defendants have shown that at least some of the accommodations

that Trego claims Defendants agreed to were not, in fact, reasonable. *See* DN 53, PageID# 1241

(citing Sixth Circuit precedent to argue that providing Trego assistance with lifting tasks is not a reasonable accommodation). By failing to address the reasonableness of the accommodations she claims were provided, Trego has not evidenced that she was "otherwise qualified" as an Animal Care Attendant.

### 2. Excessive Absenteeism

Notwithstanding Trego's physical limitations, Trego's deficient attendance record negates any argument that she was "otherwise qualified" for her position. Trego was responsible for taking care of animals and performing certain cleaning duties at the shelter. Thus, it goes without saying that her physical presence at the Animal Shelter was an "essential function" of her job. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 762-63 (6th Cir. 2015) ("Regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones.").

It is undisputed that, as of August 2018, Trego had "accumulated 39 days of absences due to medical leave and had not received approval for nine of those absences." *Id.* Trego attempts to overcome Defendants' challenge to her claim by maintaining that at least some of her absences "were caused by Defendants' unreasonable requirements and refusal to let her work." DN 48, PageID# 1163. However, her position is untenable.

The Bullitt County Government Employee Handbook provides the following: a "Department Executive . . . may require an employee to provide proof of necessity to support a request for leave of absence"; "[i]n the event of medical disability, the dates for beginning and ending a leaves of absence are a matter to be determined by an employee's physician"; and "[p]ersonal leaves in excess of 30 calendar days and extensions of personal leave must be approved in advance by the Department Executive and the County Judge/Executive." DN 37-6, PageID#

447, 454. Trego was unable to return to work because she failed to comply with this provision of BCFC policy. "Absenteeism that is unrelated to disability may indeed render a plaintiff unqualified," while "absenteeism that can be cured with a reasonable accommodation is treated differently." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 418 (6th Cir. 2020). Here, the absences at issue were completely unrelated to Trego's disability and could not have been cured by any reasonable workplace accommodation.

Trego's arguments regarding the "unfairness" of the BCFC policy are also wholly underdeveloped. She cites no authority to support her contention that the policies requiring her to submit certain medical documents, as well as the turnaround time for doing so, were "arbitrary" or "unreasonable." DN 48, PageID# 1163, 1165. Instead, she relies on conclusory assertions to that effect. She also provides no evidence that the return-to-work policies were "disparately enforced against her." *Id.*, PageID# 1164. Likewise, Trego does not substantiate her claims that Defendants' requirement that she provide a statement of medical release while wearing a heart monitor in September 2018 and the timeframe for doing so were "unreasonable." DN 1-2, PageID# 14.

## C. Alleged Failure to Provide Reasonable Accommodations

In addition to her failure to show that she was "otherwise qualified" for her position, there are other reasons that Trego cannot sustain her claim that Defendants did not to provide reasonable workplace accommodations in violation of 42 U.S.C. § 12112(b)(5)(A). "Once an employee requests an accommodation, the employer . . . must 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018) (quoting *Mosby-Meachem*, 883 F.3d at 605-06). At that point, both the employee and employer must engage in an "interactive

process requir[ing] communication and good-faith exploration of possible accommodations.'" *Kleiber*, 485 F.3d at 871 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), judgment vacated on other grounds, 535 U.S. 391 (2002)). However, "[a]n ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)). "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* (quoting *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

At the outset, the Court notes that there is little evidence that Trego and BCAC management engaged in an "interactive process" to determine reasonable workplace accommodations for Trego when she was hired. Trego admits that she never made any requests for accommodations in writing. DN 37-3, PageID# 280. However, in accordance with Trego's deposition testimony,[1] the Court will assume that Trego and BCAC management verbally agreed to at least some accommodations at the time she was hired in the summer of 2017. Even so, the details of these accommodations are vague at best. Equally unclear is how the parties decided on these accommodations or, as already discussed, if the purported accommodations were "objectively reasonable." Consequently, there is no basis for a jury to conclude that, upon her hiring, Trego proposed "objectively reasonable" accommodations and Defendants refused to cooperate.

Trego's argument that Defendants violated the ADA by "retract[ing] previously provided accommodations" after the August 23 meeting (DN 48, PageID# 1170-71) is also unsustainable. Aside from Trego's failure to establish that any "previously provided accommodations" were

_____

[1] DN 37-3, PageID# 272, 278, 280.

"objectively reasonable" to begin with, Trego has also not shown that she made a good faith effort to engage in the interactive process when she returned from medical leave in late August 2018. The record is clear that Defendants wanted to clarify with Trego the exact nature of her workplace limitations and the types of accommodations she would need going forward. On August 17, 2018, toward the end of Trego's medical leave, Nemes sent Trego an email stating:

> [T]he Judge/Executive's office and BCAC management are aware that you may need reasonable accommodations due to your disability. What these accommodations look like can only be determined by a medical professional who has treated you as a patient. This is the purpose and function of the HCAF...to provide us with a clearcut document detailing what aspects of your job you can and cannot perform safely. As of this email we have yet to receive such documentation.

DN 37-26, PageID# 566. Of note, in this email Nemes emphasized the importance of the HCAF documentation to the process of determining reasonable accommodations for Trego upon her return to work.

As of August 9, 2018 Trego was on notice that she needed to provide the HCAF documentation referenced in the August 17 email.[2] DN 37-16, PageID# 503; DN 37-26, PageID# 564. Nonetheless, Trego did not submit the documentation to BCAC management until after the close of business on August 21. DN 40-3, PageID# 906. As the HCAF documentation was necessary for BCAC management to understand Trego's disability and limitations, by failing to timely submit this documentation—despite having an extended submission deadline to do so— Trego impeded the "interactive process" of determining reasonable accommodation upon returning from medical leave.

---

[2] Defendants claim that Trego received a certified letter with this information on August 8, 2018. DN 37-16, PageID# 503; DN 37-26, PageID# 564. In her opposition brief, Trego indicates that the letter was received on August 9. DN 48, PageID# 1166. This one-day difference has no impact on the Court's findings.

Trego offers no evidence to the contrary. Rather, she argues that the deadline for the HCAF submission was unfair. DN 48, PageID# 1174 (indicating that the time she was allowed for returning that HCAF was not reasonable), 1178 (stating that "the 12 days provided [to return the HCAF] were unreasonable"). In addition, at various points in her opposition brief, Trego claims that she did timely submit the HCAF. *See* DN 48, PageID# 1156, 1166, 1178-79. This is patently false. Assuming Trego submitted the HCAF at 5:11 pm on August 21, 2018, as she maintains, this was not a timely submission. In an email sent to Trego on August 14, Nemes informed Trego that the documents were due by the close of business on August 21. DN 37-26, PageID# 564. Moreover, in the same email that Trego relies on as evidence of her timely submission, Nemes clearly states "A deadline was set for the paperwork to be submitted to BCAC management before EOB (i.e. 4:00 p.m.) on 08/21/2018." DN 40-3, PageID# 906. Hence, Trego's 5:11 pm submission was unequivocally late.

In sum, Trego has not shown that she proposed any "objectively reasonable" accommodations with which Defendants refused to comply or that any previously agreed upon "objectively reasonable" accommodations were in place and later removed. Conversely, Defendants have evidenced that Trego impeded the interactive process of discussing her workplace limitations and exploring appropriate accommodations.

### D. Conclusion

The Court finds that Defendants have shown that no genuine issue of material fact exists as to whether Trego was not "otherwise qualified" for her position as an Animal Care Attendant with or without reasonable accommodation. Trego has failed to meet her evidentiary burden in response and, thus, has not established that she is entitled to ADA protection for her discrimination claims arising from her employment with BCFC. Insofar as Trego's discrimination claim relies on

Defendants' purported refusal to accommodate, this argument also fails. [3] Accordingly, the Court will enter summary judgment in favor of Defendants on these claims.

### VI.     *Discrimination Under the Kentucky Civil Rights Act*

Because the framework for analyzing disability discrimination claims in Kentucky mirrors that of the ADA,[4] for all the reasons cited above, the Court will enter summary judgment in favor of Defendants on Trego's discrimination claims brought under the Kentucky Civil Rights Act.

### VII.    *Alleged Inquiries into Trego's Disability*

Under the ADA it is unlawful for employers to "make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability" (42 U.S.C. §12112(d)(2)(A)) or, once an employee is hired, to "make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity," 42 U.S.C § 12112(d)(4)(A).

#### A.   *Alleged Violation of 42 U.S.C. §12112(d)(2)(A)*

Trego claims that Greenup inquired into her disability by contacting the office of Social Security Disability Insurance before she was hired. DN 1-2, PageID# 18. This allegation has no basis in fact, as Trego has admitted that it was she who contacted the office of Social Security Disability Insurance on speakerphone with Greenup present so that they might discuss Trego's work hour limitations. DN 37-3, PageID# 274. There is no evidence that Greenup inquired into

---

[3] The Court further notes that the record, read in the light most favorable to Trego, is also insufficient to support a disparate treatment claim under 42 U.S.C. § 12112(b)(1) or (b)(3), even if Trego were "otherwise qualified." The affidavit of a former co-worker stating that she believed that Trego was sometimes "singled out" by BCAC management is hardly sufficient basis for a jury to conclude that Trego was treated less favorably or held to a different standard than her co-workers because of her disability. *See* DN 40-3, PageID# 881-83.

[4] *See Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007) ("The language of the KCRA, Ky. Rev. Stat. § 344.010 *et seq.*, mirrors that of the ADA; consequently, claims brought under the KCRA are interpreted consistently with the standards developed under the ADA." (citing *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 190-91 (2002)).

the "nature or severity" of Trego's disability and, hence, Trego has failed to show any violation of 42 U.S.C. §12112(d)(2)(A).

### B. Alleged Violations of 42 U.S.C. §12112(d)(4)(A)

Trego alleges that Defendants violated 42 U.S.C. §12112(d)(4)(A) on two occasions: first, by requiring her to submit a work release letter from her treating physician after Defendants received notice that Trego was wearing a heart monitor while at work, and second, when Nemes physically went to Trego's doctor's office to inquire about her restrictions. DN 1-2, PageID# 19. According to Trego, neither of these actions were "job-related and consistent with business necessity." DN 40-1, PageID# 819, 821.

Not all medical inquiries are prohibited by 42 U.S.C § 12112(d)(4)(A), but only those "'that do not serve a legitimate business purpose.'" *E.E.O.C. v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998) (quoting 29 C.F.R. § 1630.13(b)). An employer "'may make inquiries into the ability of an employee to perform job-related functions.'" *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011) (quoting 42 U.S.C. § 12112(d)(4)(B)). Notably, an employer may ask disability-related questions "when an employee who has been on leave for a medical condition wants to return to work," so long as the "employer has a reasonable belief that [the] employee's present ability to perform essential functions will be impaired by a medical condition or that he or she will pose a direct threat because of a medical condition." Questions and Answers: Enforcement Guidance On Disability-related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA), 2000 WL 33407183, at *4.[5] In such cases, any inquiries

---

[5] While not binding, the Sixth Circuit considers EEOC Guidance to be "'very persuasive authority in questions of statutory interpretation of the ADA.'" *McDonald v. Webasto Roof Sys., Inc.*, 570 F. App'x 474, 476 (6th Cir. 2014) (per curiam) (quoting *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012)).

"must be limited in scope to what is needed to determine whether the employee is able to work." *Id.*

*Work Release While Wearing Heart Monitor*. Trego had just returned from an extended medical leave and was working under specific physical restrictions when Defendants were notified that she would be wearing a heart monitor. *See* DN 37-14, PageID# 495 (stating that Trego was able to return to work with restrictions on August 21, 2018); DN 37-19, PageID# 531 (indicating that, as of August 27, 2018, Trego would be wearing a heart monitor for thirty days). Therefore, Defendants had reasonable belief that Trego's present ability to perform essential functions would be impaired by a medical condition and they had the right under 42 U.S.C § 12112(d) to make disability-related inquiries. Trego concedes that Defendants "initially engaged in permissible conduct by asking if [she] could work with the heart monitor." DN 51, PageID# 1229. She contends, however, that "once [she] responded that she could work, the additional requirement that she provide medical documentation, including information about restrictions which she had *not requested*, crossed the line into a disability-related inquiry." DN 51, PageID# 1229.

Trego cites no authority for the proposition that asking an employee to provide a statement from her attending physician indicating that the employee is cleared to work—as opposed to merely taking the employee at her word—constitutes a "disability-related inquiry." Indeed, Sixth Circuit caselaw on this issue suggests the opposite. In *Lee v. City of Columbus*, an employer policy required any employee returning from sick leave to submit to his or her supervisor a note from the employee's attending physician stating, *inter alia*, the nature of the employee's illness and that the employee was "capable of returning to regular duty." 636 F.3d 245, 248 (6th Cir. 2011). The plaintiff contended, and the lower court held, that the policy essentially required an employee to share his "general diagnosis" with his supervisor and, because this was equivalent to inquiring

24

about the employee's disability, the policy should be treated as an "impermissible disability-related inquiry." *See id.* at 251 (citing *Lee v. City of Columbus*, 644 F. Supp. 2d 1000, 1012 (S.D. Ohio 2009)).

The Sixth Circuit disagreed, stating:

> First, we do not find the requirement that an employee provide a general diagnosis—or in this case, an even less specific statement regarding the "nature" of an employee's illness—to be tantamount to an inquiry "as to whether such employee is an individual with a disability or as to the nature or severity of the disability" under § 12112(d)(4)(A). By painting with such a broad brush, and finding suspect any routine or general inquiry simply because it "may tend to reveal" an employee's disability, the . . . court has unnecessarily swept within the statute's prohibition numerous legitimate and innocuous inquiries that are not aimed at identifying a disability. Obviously, asking an employee whether he is taking prescription drugs or medication, *see Doe*, 531 F.3d at 358-59, or questions "seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the past[,]" trigger the ADA's . . . protections. *Scott*, 717 F. Supp. 2d at 1084-85. Asking an employee returning to work to describe the "nature" of his illness, however, is not necessarily a question about whether the employee is disabled.

*Lee*, 636 F.3d at 254-55. Thus, the Sixth Circuit has found it permissible for an employer to seek documentation from an employee's attending physician after an employee returns from medical leave without triggering the protections of the ADA.

Here, the information that Defendants were seeking to obtain from Trego's attending physician was even more innocuous than in *Lee*, in that Defendants only wanted to confirm that Trego was cleared to work without restrictions. There was, therefore, little danger that Defendants' request would elicit information as to "the nature or severity" of Trego's disability.[6] In sum, Trego

---

[6] The note that Trego's physician eventually submitted merely stated that Trego was "okay in wearing the event recorder during her working hours without any precautions." DN 40-3, PageID# 923.

has not provided evidence that Defendants engaged in the type of inquiry that is prohibited under 42 U.S.C § 12112(d)(4)(A) and her claim cannot survive summary judgment.

*Nemes' Visit to Trego's Physician's Office*. Nemes testified that he went to Trego's physician's office seeking clarification as to the return-to-work date specified on a note that Trego submitted on September 28, 2018. *See* DN 40-3, PageID#, 922, 988. DN 45, PageID# 1032. Trego alleges in her complaint that "[o]n September 28, 2018, Defendant Nemes barged in unannounced to Plaintiff's primary care physician's office . . . and demanded to examine Plaintiff's medical records" (DN 1-2, PageID# 15) and maintains that at least a genuine issue of material fact exists as to the purpose of Nemes' visit. DN 40-1, PageID# 821. However, the Court finds the record devoid of any proof that Nemes made an inquiry as to Trego's medical records when he visited Trego's physician's office. There is, thus, no basis for this Court to conclude that Nemes inquired about the nature or severity of Trego's disability.

Trego next argues that, regardless of the subject of his inquiry, Nemes' conduct was in violation of 42 U.S.C. § 12112(d)(4)(A) and Trego is entitled to summary judgment on this claim. DN 40-1, PageID# 821. According to Trego, the fact that Nemes' went to Trego's physician's office to inquire about Trego at all is proof that he engaged in a disability-related inquiry. DN 51, PageID# 1232. On the other hand, Defendants maintain that "merely speaking with Plaintiff's doctor's office is not a per se violation of the ADA and Plaintiff provides no authority to the contrary." DN 45, PageID# 1032. The Court agrees with Defendants. If, as the record indicates, Nemes went to Trego's doctor's office to seek clarification about Trego's return-to-work date, this was not an inquiry that was likely to elicit information about Trego's disability and, thus, was not prohibited under the ADA. *See* Questions and Answers: Enforcement Guidance On Disability-related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities

Act (ADA), 2000 WL 33407183, at *2 ("Questions that are not likely to elicit information about a disability are always permitted[.]"). Though Nemes' conduct may have been inconsiderate and run afoul of social norms, Trego has not provided evidence that he engaged in an inquiry that violated 42 U.S.C. § 12112(d). Accordingly, there is no factual basis for Trego's claim and Defendants are entitled to summary judgment.

### VIII.   Retaliation Under 42 U.S.C. § 12203

"Retaliation claims brought under the ADA are analyzed in the same manner as retaliation claims brought under Title VII." *Cook v. Garner*, No. 19-5931, 2020 U.S. App. LEXIS 19024, at *9 (6th Cir. June 17, 2020) (citing *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997)). None of Trego's retaliation claims "require the conclusion that unlawful retaliation was a motivating factor" in Defendants' alleged adverse actions. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). Rather, the Court must make "inferences or presumptions" to conclude that Defendants' intended to retaliate against Trego and, therefore, must apply the *McDonnell-Douglas* burden-shifting framework. *Norbuta v. Loctite Corp.*, No. 98-3013, 1999 U.S. App. LEXIS 10652 at *4 (6th Cir. May 20, 1999).

Under *McDonnell-Douglas*, a plaintiff must establish a prima facie case by showing that "(1) she engaged in protected activity, (2) defendant took an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action." *Barrett v. Lucent Techs.*, 36 F. App'x 835, 841 (6th Cir. 2002) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000)). If the plaintiff meets this burden, the defendant must establish "legitimate, nondiscriminatory reasons for the adverse employment action." *Id.* The plaintiff "must then demonstrate by a preponderance of the evidence that the proffered reasons were a mere pretext for discrimination by showing that (1) the proffered reasons have no basis in

fact, (2) the proffered reasons did not actually motivate the action, or (3) they were insufficient to motivate the action. The plaintiff bears the burden of persuasion throughout the entire process." *Id.* (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)).

A.  *Alleged Protected Activity*

"Protected activity" under the ADA "typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (quoting *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 484-85 (S.D.N.Y. 2013) (quotation marks omitted)). While "'[v]ague charges of discrimination' are generally insufficient, . . . demands that a supervisor cease his/her harassing conduct or complaints to management and less formal protests of discriminatory employment practices constitute protected activity." *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 532 (6th Cir. 2020) (internal citations and punctuation omitted).

Trego claims that she engaged in protected activity on "at least four occasions":

1. "[O]n July 19, 2018, while off work, Trego complained in an email to Craddock about Greenup allegedly discussing her medical conditions with other employees." DN 48, PageID# 1149 (citing DN 40-3, PageID# 879).

2. "[O]n August 16, 2018, Trego . . . [emailed] Nemes, Greenup, Craddock, and Roberts that "I feel like I am being treated different bc of my disability[.]'" *Id.* (citing DN 40-3, PageID# 902).

3. "[O]n August 23, 2018, Trego was brought in for a disciplinary meeting with Nemes, Greenup, and Craddock. At the meeting, Trego complained that she was called derogatory names and held to a different standard from her co-workers." *Id.* (citing DN 40-3, PageID# 909).

4. "[O]n September 27, 2018, Trego . . . complained that not being able to park her car by the trash caused a hardship when taking out the trash and that she could not properly do her job in caring for and cleaning the cat kennels if she could not pick up cats and transfer them. She stated that 'this is unfair and you are discriminating against me bc of my health[.]'" *Id.* at 1150 (citing DN 39-1, PageID# 795).

Defendants maintain that Trego did not engage in protected activity (DN 37-1, PageID# 1018). However, the Court finds that Trego's emails complaining to her superiors about alleged discriminatory treatment constitute protected activity. Nonetheless, Defendants are entitled to summary judgment on other grounds, as discussed below.

### B.  *Alleged Adverse Actions*

"An adverse employment action occurs when a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. . . . [A]n employee's decision to report discriminatory behavior does not immunize that employee from petty slights or minor annoyances that often take place at work and that all employees experience." *Davis v. Metro Parks & Rec. Dep't*, 854 F. App'x 707, 714 (6th Cir. 2021) (internal citations and quotation marks omitted). In Count IV of the complaint Trego identifies the following as "adverse actions" that took place "after her opposition" to allegedly discriminatory acts and a hostile work environment:

1. "On or about August 23, 2018, Plaintiff was written up four times by Defendants Greenup, Craddock, and Nemes after she had been off work for a month." DN 1-2, PageID# 24.

2. "After the August 23, 2018 meeting, Defendants Greenup and Nemes would assign non-supervisory staff to supervise the Plaintiff which they had never done before.

Defendants Greenup and Nemes even placed a baby monitor in the trailer where Plaintiff worked to monitor her and attempt to find pretextual reasons to fire her." *Id.*

3. "Defendant Greenup and Nemes made it increasingly difficult for Plaintiff to perform her job duties and repeatedly dispersed confidential medical information to her co-workers." *Id.*

4. "Defendant Nemes . . . went to Plaintiff's primary care provider and attempted to force them to turn over confidential medical records." *Id.*

5. "On or about October 16, 2018 Plaintiff was constructively terminated through the pretextual elimination of her position." *Id.*

6. At the August 23, 2018 meeting, Defendant Craddock "asked Trego why she wished to stay at the job if she was unhappy, and then told her nothing was tying her down to her current job, and that it was not worth her remaining at the job." DN 48, PageID# 1176 (citing DN 40-3, PageID# 909).

It is unclear whether Trego has abandoned the assertion that items 2, 3, and 4 constitute "adverse employment actions," as she does not include these events in her discussion of such actions in her responsive brief. *Compare* DN 1-2, PageID# 24-25 *with* DN 48, PageID# 1159. In any event, the Court finds that the only actions Trego alleges that could possibly support a retaliation claim are items 1, 5, and 6. The remaining items are insufficiently supported by the evidence, not backed by any authority, and/or do not rise to the level of a materially adverse employment action.[7]

---

[7] The generalized grievance that Defendants "made it difficult" for Trego to complete her work does not evidence a conflict of material fact to be decided by the jury and Trego cites no authority suggesting that a heightened level of supervision is indicative of a materially adverse employment action. Defendants also offered a legitimate, non-retaliatory reason for placing a baby monitor in the cat trailer, in that the monitor facilitated communication with the workers in the trailer while allowing management to observe how the animals in the trailer were being treated. DN 37-27, PageID# 623-24. Regarding the allegation that Defendants "repeatedly dispersed" her confidential medical information, Trego relies on evidence that is unspecific as to the date of these purported events. *See* Affidavit of

*Disciplinary Writeups.* With respect to the disciplinary actions taken against Trego on August 23, 2018, the Sixth Circuit has made clear that "[a] written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012). Of the four actions Trego cites from August 23, only one—the disciplinary action for the defamatory social media post—"led to a materially adverse consequence." DN 37-21. The other three actions either resulted in a "reprimand" or "counseling/warning." *See* DNs 37-7, 37-10, 37-13. There is evidence in the record showing that Defendants had a legitimate, non-retaliatory and non-discriminatory reason for imposing a one-day suspension for Trego's derogatory social media post, as her conduct was in violation of BCFC policy. *See* DN 37-21, PageID# 533. Trego does not dispute the factual basis for her suspension, nor does she argue that the cited reasoning for the discipline was merely pretextual. *See* DN 48, PageID# 1178-79 (arguing that the other three disciplinary writeups were "pretextual" in nature). Thus, Trego has offered no evidence to show that any of the disciplinary writeups from August 23 could form the basis for a retaliation claim.

*Constructive Termination.* To prevail on her constructive discharge claim, Trego must show "that 'working conditions would have been so difficult or unpleasant that a reasonable person in [Trego's] shoes would have felt compelled to resign.'" *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 618 (6th Cir. 2020) (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008)). Even assuming Trego has met this standard, her claim

---

Sommer Schuster, DN 40-3, PageID# 882 (indicating that at various times Greenup shared Trego's medical information with others at the Animal Shelter but does not indicate if this purported conduct began before or after Trego engaged in protected activity). Moreover, Trego does not explain how, even if true, the sharing of her medical information constituted an adverse employment action. Finally, Trego fails to link Nemes' visit to her physician's office to any specific outcome, adverse or otherwise, related to her employment.

still fails. Defendants have put forth a legitimate, neutral reason for combining two part-time Animal Care Attendant positions into one full-time position, stating that a "review of the operations and finances of" BCAC revealed that "it would be more effective and efficient" to do so. DN 37-28, PageID# 645. Trego has not presented any evidence that raises doubts about Defendants' motivation for its business decision and this Court "is not a 'super personnel department' tasked with 'second guessing'" such decisions. *Treadway v. Cal. Prods. Corp.*, 659 F. App'x 201, 210 (6th Cir. 2016) (quoting *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013). In short, because Trego has provided no basis for a reasonable jury to accept her claim that Defendants' decision to combine the part-time positions was unlawful, her retaliation claim based on constructive discharge cannot survive summary judgment.

*Suggestion to Seek Other Employment.* Trego maintains that *Queen v. City of Bowling Green*, 956 F.3d 893 (6th Cir. 2020) stands for the proposition that an employer's suggestion that an employee "find work elsewhere" constitutes an adverse employment action. DN 48, PageID# 1159, 1176. In *Queen*, the plaintiff firefighter, Queen, complained to his supervisor, Rockrohr, about workplace harassment and a hostile work environment. 956 F.3d at 896. According to Queen:

> Rockrohr "responded in hostility and didn't take it well and kind of shut the conversation down and told [Queen] that [he] needed to remember [his] place."
>
> About a day or two later, Rockrohr told Queen that he had discussed the matter with the fire chief and they both believed that Queen "needed to get employment somewhere else." When Queen asked why, Rockrohr answered that it was because Queen's "EMT had expired." Rockrohr also advised Queen that "things aren't working out for you, you need to look—be looking for something else," and that they should both have a meeting with the fire chief. Just before that planned meeting, however, Queen told Rockrohr that he "was sorry" and "would try to do better, try to fit in better." Rockrohr accepted Queen's apology and stated, "if you can promise not to

> make any more problems . . . I'll forego the meeting with the chief .
> . . but you need to watch yourself, you're going to be on the radar
> for a while."

*Id.* at 896-97 (internal citations omitted). The district court denied summary judgment on Queen's

retaliation claim and the Sixth Circuit affirmed, stating:

> A reasonable jury could conclude that Rockrohr's subsequent
> conduct after receiving Queen's complaint about the harassment he
> faced . . . (which conduct included Rockrohr's suggestion that
> Queen "should get employment elsewhere" because "things [were]
> not working out") went far enough to amount to a materially adverse
> action. Indeed, Rockrohr's specific admonition made directly to
> Queen that he "should get employment elsewhere" could be
> interpreted by reasonable jurors to convey the message that Queen
> was no longer welcome[.]

*Id.* at 904.

The Court finds the facts of the instant case distinguishable from those of *Queen*.

According to Nemes, during the August 23, 2018 meeting, after Craddock explained to Trego that

Trego's complaints had been investigated and that "Trego's accusations could not be verified," the

following transpired:

> Deputy Judge Craddock told Ms. Trego that it was apparent that she
> was unhappy in her current position. Ms. Trego agreed that this was
> indeed the case. Deputy Judge Craddock asked why she wished to
> stay. She stressed to Ms. Trego that nothing was tying her to her
> current job. That the stress and anxiety she felt was not worth a ten
> (10) hour per week part time gig. Ms. Trego retorted that she
> shouldn't have to leave her job and that Deputy Judge Craddock
> should "fix" the situation at hand. Deputy Judge Craddock asked
> Ms. Trego how she wanted the situation resolved. Ms. Trego did not
> have an answer. Deputy Judge Craddock asked if Ms. Trego wanted
> Director Greenup fired. Ms. Trego stated that she did not. Deputy
> Judge Craddock asserted that she could not "fix" personality
> clashes.

DN 40-3, PageID# 909. Trego does not challenge Nemes' account of the above exchange between Craddock and Trego; indeed, she relies on it as evidence. Thus, there is no dispute of fact between the parties as to what was said. Rather, it is the significance of the exchange that Trego contests.

Trego asserts that Craddock's statements "insinuate[ed] [that Trego] should quit" and attempts to draw parallels to *Queen*. DN 48, PageID# 1159, 1176. However, unlike the statements made by Queen's supervisor, Craddock's statements were couched in a conversation about how Trego felt about her job situation and resolving Trego's complaints to her satisfaction. Trego has not shown that Craddock stated or implied that Trego should retract her previous complaints or avoid making such complaints in the future in order to keep her position. After a one-day suspension for her defamatory social media post, Trego was permitted to return to her job and she continued to report purportedly unfair and discriminatory conduct. *See* DN 39-1, PageID# 795 (complaining on September 27 to BCAC management about allegedly discriminatory conduct). In other words, Trego has not demonstrated that Craddock's conduct after receiving Trego's harassment complaints would have "dissuaded a reasonable worker from making or supporting" such complaints in the future and, thus, has not shown that there is a genuine issue of material fact as to whether Craddock's statements amounted to a materially adverse employment action.

Having found that Trego has not evidenced that she experienced an adverse employment action after she engaged in protected activity, Trego's ADA retaliation claim lacks an essential element and must fail. Summary judgment on this matter will be entered in favor of Defendants.

### IX. *Retaliation Under the Kentucky Civil Rights Act*

Because "claims brought under the KCRA are interpreted consistently with the standards developed under the ADA," *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007), Trego's

retaliation claim brought under Kentucky law fails for the same reasons that the ADA retaliation claim fails.

### X.    *Hostile Work Environment*

The Sixth Circuit recognizes a cause of action for a hostile work environment under the ADA if the plaintiff can show that: "(1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures." *Trepka v. Bd. of Educ. of the Cleveland City Sch. Dist.*, 28 F. App'x 455, 461 (6th Cir. 2002) (citations omitted). "Harassment" here means "conduct that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "Merely offensive" conduct will not support a claim of hostile work environment. *Id.* (citing *Harris*, 510 U.S. at 21). Moreover, to prevail on this claim "an employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).

Though Trego makes the general allegation that she "was subjected to an objectively severe and pervasive hostile work environment" (DN 1-2, PageID# 20), nowhere in her complaint does Trego properly lay out a hostile work environment claim. Strewn throughout the complaint are broad assertions about "harassment" that Trego allegedly experienced at work, including Greenup and Nemes "periodically" verbally harassing her, "name calling," and "question[ing] her about her disability" (DN 1-2, PageID# 11, 12); Greenup "throwing binders across the room in an intimidating fashion" (*Id.*, PageID# 11); Greenup "harassing" her "about her disability in front of

other employees" (*Id.*, PageID# 12); and Greenup and Nemes "standing over her as she worked and making disparaging comments" (*Id.*, PageID# 14). Elsewhere in the complaint, she makes the ambiguous statements that "Greenup and Nemes made it increasingly difficult for Plaintiff to perform her job duties," DN 1-2, PageID# 22, 24, and that BCFC "failed to take remedial or corrective action" despite having knowledge of "discrimination, hostile work environment, and failure to accommodate," *Id.*, PageID# 17, 20, 26. From these scattered and vague allegations, Trego attempts to convince the Court that she has properly established a hostile work environment claim.

Yet, a "plaintiff's complaint . . . 'must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory.'" *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007)). Trego's complaint falls very short of meeting this standard. Nonetheless, even if Trego's hostile work environment claim was properly asserted in the complaint, she has not offered evidence to satisfy the necessary elements.

No one disputes that Trego was disabled when she was employed as an Animal Care Attendant. However, this is the only element of a hostile work environment claim that she has clearly established. Of all the conduct Trego alleges, only that which was motivated by bias could possibly amount to discriminatory harassment. While Trego "need not prove [Defendants'] motivation, . . . she should at least provide some evidence of discrimination." *Trepka*, 28 F. App'x at 462. Trego offers no evidence from which a reasonable jury could begin to determine that Defendants acted because of Trego's disability rather than some other motivation. It is even uncertain whether the purported "name calling," without more information, was based on Trego's disability. As to the remaining alleged conduct in the complaint, none of it even approaches the

severity and pervasiveness required to show "harassment" for the purposes of a hostile work environment claim.[8]

In sum, Trego has failed to present evidence that raises a genuine issue of material fact as to whether she was subjected to a hostile work environment and Defendants are entitled to summary judgment on this claim.

For all the reasons cited in this opinion, the Court, in a separate order, will grant summary judgment in favor of Defendants on all state and federal claims. Trego's motion for partial summary judgment will be denied.

---

[8] In her responsive brief, Trego adds several other alleged instances of "harassment," including Nemes taking her cleaning supplies and moving them while she was working, Defendants not allowing Trego to have assistance with taking out the trash, Nemes "stand[ing] in the doorway to watch her work," Nemes telling Trego that he had "never heard of somebody having so many diseases," Defendants requiring Trego to park in the main parking lot instead of near the cat trailer, Defendants not allowing her reasonable time to return her HCAF paperwork, and Defendants not investigating her claims of discrimination. DN 48, PageID# 1173-75. Trego relies heavily on an affidavit from one of her former co-workers, Sommer Schuster, in which Schuster claims that Trego was "treated differently than other employees," "Greenup would talk about [Trego's] disability behind her back," Nemes would "take pictures of work [Trego] had been doing and disrupting work she had been doing," Nemes would "always require[] more paperwork" of Trego when she missed work for medical reasons than what was required of non-disabled employees, Greenup and Nemes observed Trego working on a baby monitor placed in the cat trailer and did not observe other employees or volunteers, Greenup would disparage Trego in front of other employees and "single her out," and Greenup and Nemes would "nitpick at [Trego's] performance over and over in an obvious manner which they did not do with other staff members." DN 40-3, PageID# 882-83.

Again, none of this alleged conduct is sufficiently severe or pervasive to constitute harassment and Trego has not shown how her work performance was affected. There is also no evidence that any of these actions were motivated by bias toward Trego due to her disability.

June 29, 2022

Charles R. Simpson III, Senior Judge
United States District Court